IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**AUDRA M. MADINGER,**

       **Plaintiff,**

  v.                                    **Civil Action 2:16-cv-882**
                                            **Judge James L. Graham**
                                            **Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL
SECURITY,**

       **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Richard L. Saylor, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying Audra M. Madinger's application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability finding and **REMAND** this case to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g).

    **I.**    **BACKGROUND**

Madinger filed her application for DIB on April 30, 2013, alleging that she was disabled beginning July 17, 2012. (Tr. 183–90). After her application was denied initially and on reconsideration, (Tr. 125–31, 136–47), Madinger filed for judicial review of the ALJ's decision on September 14, 2016, (Doc. 1). Upon agreement of the parties, the Court remanded the case to the Agency under Sentence Six of 42 U.S.C. § 405(g), so that the Appeals Council could review additional evidence submitted by Madinger. (Doc. 18). On August 9, 2018, the Appeals Council issued an order, stating that it had considered the additional evidence, but denying the request for

1

review, (Tr. 792–97), rendering the ALJ's decision the final decision of the Commissioner. On October 16, 2018, the Court reopened this case, (Doc. 21), and this matter is now ripe for consideration. (*See* Docs. 30, 31, 32). Madinger died in March 2017. (Tr. 806).

Below, the ALJ found that Madinger met the insured status through December 31, 2017, and had not engaged in substantial gainful activity since July 17, 2012, the alleged onset date. (Tr. 20). The ALJ determined that Madinger suffered from the following severe impairments: degenerative disc disease of the lumbar spine status-post microdiscectomy and laminectomy (August 2012); degenerative disc disease of the cervical spine status-post anterior cervical discectomy and fusion with plating (January 2013); cervical radiculopathy; lumbar radiculopathy; degenerative disc disease of the thoracic spine; fibromyalgia; and obesity. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 24).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CR 404.1567(b) and 416.967(b) with the following additional limitations: In an eight-hour workday, the claimant could stand and walk four hours. The claimant could frequently operate foot controls. She could occasionally balance, stoop, kneel, crouch, and crawl. She could never climb ladders, ropes, or scaffolds. She could frequently handle, finger, and feel.

(Tr. 25).

### A. Relevant Medical Background

The record documents Plaintiff's spinal issues and chronic pain. A July 2011 MRI revealed bulging of the L4-5 disc with mild bilateral neural foraminal narrowing; degeneration and central protrusion of the L5-S1 disc into the epidural fat without narrowing. (Tr. 301). In February 2012 Madinger's primary care physician, Dr. Butterfield, found "diffuse trigger points," noting "[a]t least 7 of 11 locations for fibromyalgia." (Tr. 437–38). A March 2012 cervical spine MRI revealed

subligamentous protrusion of the C2-3, C405, and C506 discs; central protrusion of the C3-4 disc mildly indenting the thecal sac; and bulging of the C6-7 disc. (Tr. 299). On May 14, 2012, Madinger presented to the emergency room with severe back pain but denied any numbness, weakness, or tingling at that time. (Tr. 326). The exam documented tenderness and pain in the cervical thoracic, and lumbar spine regions. (*Id.*). A July 2012 MRI showed moderate left paracentral disc herniation flattening the left dural sac and posteriorly displacing left S1 nerve root; and L4-5 disc bulge with bilateral foraminal extension encroaching upon dural sac and right greater than left L5 nerve roots. (Tr. 280). Exam records from that month document significant pain with the rare ability to walk due to pain. (Tr. 431). She was found to be markedly tender over the lumbosacral muscles and markedly positive straight leg raising with any elevation of the legs. (*Id.*). In August 2012, she underwent a microdiscectomy of the L5-S1. (Tr. 368).

Records from a January 2013 MRI show C6-7 paracentral disc protrusion with subtle effacement of the right hemicord and mild right lateral recess stenosis, as well as midline disc protrusion C3-4 with central canal stenosis and spinal cord effacement. (Tr. 282). Also in January 2013, Madinger underwent an anterior cervical microdiscectomy at the C6-7 and an interbody fusion. (Tr. 388).

In January 2014, Madinger saw Dr. Ron Linehan, complaining of neck and upper extremity pain. (Tr. 496). Exam records document obesity, mild distress, decreased range of motion to the cervical spine with pain during extension, and tenderness to palpation along the cervical paraspinal and trapezius muscle regions. (Tr. 496–97). She had reduced or absent reflexes at the biceps but normal sensation throughout both upper extremities. She retained nearly full strength in all muscle groups of both upper extremities. (Tr. 497). The next month, she received epidural steroid injections but had an adverse reaction and was reluctant to continue treatment. (Tr. 495). Dr.

3

Linehan referred Madinger to neurosurgeon Dr. James Uselman for neck, back, and shoulder pain. (Tr. 579–80). On exam, Madinger exhibited good strength in both the upper and lower extremities. (Tr. 580). She maintained normal sensation, her reflexes were intact and equal, her balance was good, but she had a loss of range of motion of her right shoulder. (*Id.*).

In April 2014 Madinger saw orthopedic specialist, Dr. Keith Hollingworth, for ongoing neck pain. (Tr. 701–02). Exam records show no tenderness, swelling, deformity, instability, weakness, or atrophy. (*Id.*). She had full painless arc of motion in all planes and maintained normal muscle strength and tone. (Tr. 702).

Madinger then began seeing Dr. Dwight Mosley for pain management. (Tr. 703). Upon evaluation, Dr. Mosley documented lumbar spasm and tenderness with reduced range of motion, but otherwise normal findings, including normal range of motion, strength, sensation, and tone, without evidence of atrophy or tenderness. (Tr. 510–13).

In January 2015, neurosurgeon Joseph Shehadi observed normal gait and station, full range of motion, normal strength and reflexes, no neurosensory deficits, and no spasms, tenderness, or instability of the lumbar spine. (Tr. 705).

On April 14, 2015, Madinger's primary care physician, Dr. Jack Butterfield, completed a medical source statement. (Tr. 491–94). He listed Madinger's diagnoses as high blood pressure, depression, high cholesterol, and fibromyalgia. (Tr. 491). He noted that she suffers from chronic muscle pain and depression and deals with constant pain. (*Id.*). Dr. Butterfield also opined that Madinger can sit for about two hours in an eight-hour workday and can stand and walk for two hours in an eight-hour workday. (Tr. 492). He further opined that Madinger required a work environment that allowed her to shift positions, including allowing her to walk for ten minutes every 30 minutes. (*Id.*). He limited her to lifting less than ten pounds frequently and lifting ten

4

pounds rarely. (Tr. 493). He opined that she should never engage in postural activities and was limited in her ability to use her upper extremities. (*Id.*). Finally, he opined that Madinger would be off-task more than 25 percent of the workday, was capable of low-stress work, and would likely miss more than four days of work per month. (Tr. 494).

In May 2015, Dr. Mosley completed a medical source statement. (Tr. 604–07). He noted that Madinger suffered from radicular leg and back pain as well as muscle spasms. (Tr. 604). He opined that Madinger can stand and walk for less than two hours in an eight-hour workday and can sit for about four hours in an eight-hour workday. (Tr. 605). He further opined that she would need to shift positions and would need to walk every thirty minutes for about ten minutes. (*Id.*). He limited her ability to lift and carry and opined that she was occasionally limited in performing postural activities. (Tr. 606). Finally, Dr. Mosley opined that Madinger would be off task for 15 percent of the work day and would likely miss four or more days of work per month. (Tr. 607).

### B. The ALJ's Decision

In his decision, the ALJ first summarized Madinger's chronic pain:

> The claimant alleges disability stemming from chronic pain. The claimant reported low back and neck pain due to degenerative disc disease as well as chronic pain due to fibromyalgia. The claimant is also obese, which adversely affects her musculoskeletal and neuropathic pain. The claimant reported limited activities of daily living due to pain. She indicated that she could lift up to 20 pounds but had issues with standing and walking. She indicated that she could not drive due to neck pain. She indicated that treatment was not entirely effective, including surgery and physical therapy (Exhibits 2E, 4E, 6E, 7E, 10E). At the hearing, the claimant testified that she continued to experience pain despite surgical intervention at the cervical and lumbar spine. She testified that she had numbness in the feet, leg, and buttocks with sitting for prolonged periods. For example, she could not sit more than 30 minutes before her legs went numb. She testified that she could not lift or carry more than 15 pounds. She testified that she spent most days asleep in a recliner. She testified that she had problems using her hands and fingers due to numbness. She testified she could reach, however.

(Tr. 26).

5

Upon reviewing the evidence, the ALJ concluded that Madinger "exhibited the ability to perform a range consistent with sedentary work in light of the objective clinical findings and improvement in symptoms with aggressive treatment." (*Id.*).

Turning to the opinion evidence, the ALJ first considered the opinion of Madinger's primary care physician, Dr. Butterfield, who limited Madinger to sedentary work and exertional limitations. (Tr. 31). The ALJ assigned "minimal weight" to Dr. Butterfield's opinion. (*Id.*). He explained:

> First, the claimant testified that Dr. Butterfield asked her questions while completing the form, which suggest that he relied quite heavily, if not exclusively, on the claimant's subjective report of symptoms rather than objective clinical findings. For example, Dr. Butterfield noted "there are no objective findings other than positive trigger points." Dr. Butterfield's own treatment notes do not reflect the kinds of abnormalities typically associated with a disabling physical condition. For example, the claimant retained full or nearly full strength at the upper and lower extremities. She did exhibit objective improvement in functioning postoperatively, as noted above, including greater strength and greater range of motion. The claimant showed no signs of atrophy or muscle wasting, which is inconsistent with the inability to sit, stand, and walk, as noted by Dr. Butterfield. Further, Dr. Butterfield does not provide any objective support that the claimant would miss more than four days of work per month due to her medical conditions. Rather, this limitation appears purely speculative and is likely based on the claimant's own estimation.

(*Id.*).

The ALJ turned next to the opinion of treating source, Dr. Mosley, who treated Madinger's pain and limited her to a reduced range of sedentary work with frequent absences. (*Id.*). The ALJ found Dr. Mosley's treatment notes were inconsistent with his own treatment notes and the record as a whole. (*Id.*). He elaborated on this finding:

> This opinion is not consistent with Dr. Mosley's own treatment notes, or those of Dr. Shehadi, who saw the claimant around the same time that she received treatment through Dr. Mosley. Further, Dr. Mosley's own treatment notes reflect significant improvement, i.e. 80% improvement, in the claimants' pain and functioning following injections. Dr. Mosley failed to cite any specific objective findings to

6

support his opinions. He noted positive straight leg raising and tenderness but these findings alone are not consistent with the extreme limitations he proposes. As noted above, there is no evidence of serious abnormalities typically associated with total physical ability, such as atrophy.

(*Id*.).

As to both Dr. Butterfield's and Dr. Mosley's opinions, the ALJ found that "the evidence does not support the need to frequently shift positions during the day, elevate her legs, or otherwise cause the claimant to be "off task" and that "[n]either Drs. Mosley nor Butterfield offer any specific, objective findings to support these limitations. (*Id*.).

The ALJ next considered the opinion of Dr. Sayegh, who opined in March 2013, that Madinger should be limited to "light duty." (Tr. 31–32). The ALJ assigned "some weight" to this opinion, explaining that, "[a]lthough subsequent evidence supports greater limitation in the claimant's exertional abilities, as noted above, Dr. Sayegh's opinion is not inconsistent with the State agency medical consultants' findings or the totality of the evidence through that date." (Tr. 32).

Finally, the ALJ reviewed the opinions of the state agency medical consultants, which he "adopted" in the RFC. (*Id*.). The ALJ found that the state consultants' opinions and assessments were "largely consistent with and supported by the evidence of the record as a whole and are entitled to significant weight." (*Id*.).

**II.  STANDARD OF REVIEW**

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*

*v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

In the only statement of error, Plaintiff contends that the ALJ incorrectly applied the treating physician rule when considering the opinions of treating physicians Dr. Butterfield and Dr. Mosley. (Doc. 30 at 7–15).

First, Plaintiff asserts that the ALJ failed to properly consider Madinger's fibromyalgia when weighing Dr. Butterfiled's opinion. (*Id*. at 9–12). Madinger saw Dr. Butterfield from February 2012 to April 2015. (*See* Tr. 437–38, 434–36, 433, 432, 431, 428–30, 427, 491). During that time, Dr. Butterfield found, on physical exam, that Madinger had "diffuse trigger points," and that "[a]t least 7 of 11 locations [are] for fibromyalgia." (Tr. 437–38). Madinger routinely complained of pain to Dr. Butterfield, (*see, e.g.*, Tr. 433, 431, 428–30, 427), and on February 26, 2013, Dr. Butterfield noted that Madinger's "fibromyalgia [was] flaring and depression [was] getting worse," (Tr. 428–30). On April 14, 2015, Dr. Butterfield completed a questionnaire assessing Madinger's pain. (Tr. 491). He listed Madinger's diagnoses as high blood pressure, depression, high cholesterol, and fibromyalgia. (*Id*.). He noted that Madinger suffers from chronic muscle pain and depression. (*Id*.). As far as "clinical and objective signs," Dr. Butterfield stated that "there are no objective findings other than positive trigger points." (*Id*.). Based on his findings, Dr. Butterfield opined that Madinger could sit for roughly two hours in an eight-hour

8

workday and could stand and walk for about two hours in an eight-hour workday. (Tr. 492). He further opined that she would require a working environment that permitted her to shift positions, including allowing her to walk for ten minutes every thirty minutes. (*Id.*). Dr. Butterfield also limited Madinger to lifting less than ten pounds frequently and lifting ten pounds rarely. (Tr. 493). He restricted her from engaging in postural activities and limited her ability to use her upper extremities. (*Id.*). Finally, Dr. Butterfield found that Madinger would be off-task more than twenty-five percent of the workday, was capable of low-stress work, and would likely miss more than four days of work per month because of her symptoms. (Tr. 494).

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id*. The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937. The treating physician rule and the good reasons rule together create what has been referred to as

the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

In this case, Madinger's fibromyalgia "complicates" the treating physician rule. *Lucas v. Comm'r of Soc. Sec.*, No. 18-10087, 2019 WL 1117927, at *6 (E.D. Mich. Feb. 21, 2019), *report and recommendation adopted*, No. 18-10087, 2019 WL 1112280 (E.D. Mich. Mar. 11, 2019). As the Sixth Circuit has explained, in cases where the plaintiff has fibromyalgia, "'physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Id.* (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 817–18 (6th Cir. 1988)). And, unlike other conditions, "'[t]here are no objective tests which can conclusively confirm the disease, rather it is a process of diagnosis by exclusion and testing of certain 'focal tender points' on the body for acute tenderness which is characteristic in [fibromyalgia] patients.'" *Id.* (quoting *Preston*, 854 F.2d at 818). This means, therefore, that fibromyalgia patients generally do not present "objectively alarming signs." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

Relevant here, the unique nature of fibromyalgia matters to an ALJ's application of the treating physician rule. "The Sixth Circuit and the Social Security Administration have recognized that it makes little sense to rely on a lack of objective medical evidence when addressing both the diagnosis and treatment of fibromyalgia." *Lucas*, 2019 WL 1117927, at * 6 (citing *Rogers*, 486 F.3d at 243–44 (noting that "opinions that focus upon objective evidence are not particularly relevant" when considering fibromyalgia)). In other words, in fibromyalgia cases, an ALJ does not satisfy the "good reasons" requirement, when he or she rejects a treating source opinion largely based on a lack of objective medical evidence and/or benign findings. *See, e.g.*, *Lucas*, 2019 WL 1117927, at *6 (finding that "the ALJ's contention that the treating physician's assessments and

10

opinion were unsupported by objective medical evidence was 'simply beside the point'" (quoting *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 861–62 (6th Cir. 2011) (holding that "the ALJ's rejection of the treating physicians' opinions as unsupported by objective evidence in the record obviously stem[med] from his fundamental misunderstanding of the nature of fibromyalgia"))).

Here, the ALJ afforded Dr. Butterfield's opinion "minimal weight" because it was based on Madinger's "subjective report of symptoms rather than objective clinical findings." (Tr 31). Specifically, he discounted Dr. Butterfield's opinion for several related reasons. First, the ALJ noted that Madinger "testified that Dr. Butterfield asked her questions while completing the form, which suggests that he relied quite heavily, if not exclusively, on [her] subjective report of symptoms rather than objective clinical findings." (*Id*.). In support, he emphasized that "Dr. Butterfield noted 'there are no objective findings other than positive trigger points.'" (*Id*.). Similarly, the ALJ found that "Dr. Butterfield [did] not provide any objective support that [Madinger] would miss more than four days of work per month due to her medical conditions," finding that, "[r]ather, this limitation appears purely speculative and is likely based on the claimant's own estimation." (*Id*.).

The Commissioner contends that these explanations constitute good reasons because the lack of objective evidence and the ALJ's "apparent reliance on [Madinger's] subjective complaints detracts from the reliability of [Dr. Butterfield's] assessments." (Doc. 31 at 5–6). But this argument does not reflect Sixth Circuit law on this issue. Indeed, a "lack of 'objective' medical evidence is not unusual, but rather the norm in fibromyalgia cases." *Turner v. Colvin*, No. 1:13CV1916, 2014 WL 4930677, at *15–16 (N.D. Ohio Aug. 7, 2014), *report and recommendation adopted*, No. 1:13 CV 1916, 2014 WL 4930680 (N.D. Ohio Oct. 1, 2014); *see*

11

*also Kilgore v. Comm'r of Soc. Sec. Admin.*, No. 3:18-CV-61, 2019 WL 3220744, at *7 (S.D. Ohio July 17, 2019) (holding that the ALJ erred "to the extent he required objective evidence of fibromyalgia"). Because a lack of objective evidence is "not particularly relevant" to Madinger's fibromyalgia claim, the ALJ did not provide good reasons for discounting Dr. Butterfield's opinion. *Lucas*, 2019 WL 1117927, at * 6.

The ALJ's second explanation fares no better. He concluded that "Dr. Butterfield's own treatment notes do not reflect the kinds of abnormalities typically associated with a disabling physical condition." (Tr. 31). In support, the ALJ relied on the fact that Madinger "generally retained full or nearly full strength at the upper and lower extremities . . . exhibit[ed] objective improvement in functioning postoperatively . . . including greater strength and greater range of motion . . . showed no signs of atrophy or muscle wasting, which is inconsistent with the inability to sit, stand, and walk, as noted by Dr. Butterfield." (*Id*.). But "[t]est results showing normal strength, gait, or range of motion are not convincing evidence of lack of disability" in fibromyalgia cases. *Lucas*, 2019 WL 1117927, at *6 (citations omitted).

Indeed, "the Sixth Circuit has repeatedly and consistently recognized that fibromyalgia patients typically 'manifest normal muscle strength and neurological reactions and have full range of motion.'" *Turner*, 2014 WL 4930677, at * 15 (finding that "the fact that [treating physician's] physical examinations of [plaintiff's] extremities and neurological systems yielded normal findings [was] not necessarily inconsistent with fibromyalgia" (quoting *Kalmbach*, 409 F. App'x at 861–62)); *see also Lucas*, 2019 WL 1117927, at *6 (remanding where ALJ's "basis for rejecting a portion of [treating source's] opinion [was] the lack of objective medical evidence supporting the conclusions . . . including [plaintiff's] presentation with a normal gait, normal motor strength, non-tender extremities, normal sensation, and normal musculoskeletal range of motion"). Said

plainly, these considerations are "'simply beyond the point.'" *Lucas*, 2019 WL 1117927, at *6 (quoting *Kalmbach*, 409 F. App'x at 861–62); *see also Stork v. Colvin*, No. 3:16CV749, 2017 WL 4125009, at *6 (N.D. Ohio Sept. 18, 2017) (remanding where ALJ relied on benign findings in order to discount treating physicians' opinions regarding fibromyalgia). At base, the ALJ's assessment of Dr. Butterfield's opinion demonstrates a "'misunderstanding of the nature of fibromyalgia.'" *Lucas*, 2019 WL 1117927, at *6 (quoting *Kalmbach*, 409 F. App'x at 861).

Separate and apart from considerations regarding fibromyalgia, the Court is not persuaded that the ALJ otherwise provided good reasons for rejecting Dr. Butterfield's opinion, or that such error was harmless. Indeed, when discussing Dr. Butterfield's opinion, the ALJ did not provide good reasons pursuant to the relevant regulatory factors, such as the opinion's supportability and consistency with the record as a whole, length of the treating relationship, or the treating source's specialty. *See, e.g.*, *Lucas*, 2019 WL 1117927, at *7 (noting that, "[s]pecial considerations for fibromyalgia aside," the ALJ did provide good reasons consistent with the regulatory factors); *Eberhardt v. Comm'r of Soc. Sec.*, No. 15-13811, 2017 WL 971705, at *10 (E.D. Mich. Feb. 16, 2017), *report and recommendation adopted sub nom. Eberhardt v. Comm'r of Soc. Sec.*, No. 15-13811, 2017 WL 963049 (E.D. Mich. Mar. 13, 2017) (holding that, apart from the ALJ's error in considering plaintiff's fibromyalgia, the ALJ "did not cite record evidence that contradicts [treating source's] opinion . . . [n]or did the ALJ evaluate the other regulatory factors required to properly weigh medical opinions, such as the opinion's supportability and consistency with the record as a whole, length of the relationship between plaintiff and the treater, and the treater's specialty). Had the ALJ in this case relied on other relevant regulatory factors supporting his assessment of Dr. Butterfield's opinion, his decision could potentially stand. But the ALJ did not do so, and remand is warranted.

13

The Court is not suggesting that the mere diagnosis of fibromyalgia results in a successful claim for benefits. Rather, the Court notes that the ALJ erred in rejecting her treating physician's opinion due to benign findings and a lack of objective evidence. "It is incumbent upon the ALJ to apply the correct standard under existing Sixth Circuit precedent when evaluating fibromyalgia claims." *Turner*, 2014 WL 4930677, at *16 (quotation marks and citation omitted). Remand will provide the ALJ with the opportunity to review Dr. Butterfield's opinion pursuant to the correct standard.

Finally, Plaintiff also argues that the ALJ erred in his assessment of Dr. Dwight Mosley's opinion. (Doc. 30 at 12–15). However, the Court's decision to recommend reversal and remand regarding Dr. Butterfield's opinion alleviates the need for analysis on this argument. Nevertheless, if the recommendation is adopted, the ALJ may consider Plaintiff's remaining assignment of error on remand if appropriate.

### III. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability finding and **REMAND** this case to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g).

### IV. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or

modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   October 11, 2019                              /s/ Kimberly A. Jolson
                                                     KIMBERLY A. JOLSON
                                                     UNITED STATES MAGISTRATE JUDGE